United States District Court
Southern District of Texas
**ENTERED**
April 17, 2023
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CHARLES MORAN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL CASE NO. H-21-4214 |
| | § | |
| SIGNET MARITIME CORPORATION, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER
ENTERING FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Charles Moran has captained boats for 30 years, most recently for Signet Maritime Corporation. In September 2021, Captain Moran tripped and fell in a parking lot on his way to get a hair cut before beginning a 28-day "hitch," breaking his ankle. He notified Signet of the broken ankle but did not mention any other injury at the time. The parties disputed whether Moran broke his ankle in the service of the vessel or while running a personal errand. The parties also disputed the extent of the injuries Moran suffered and the amount of maintenance and cure or other damages he was entitled to receive. The parties agreed to try the liability issue to the jury and, depending on the outcome, to try maintenance and cure to the court.[1]

The jury found that Moran was in the service of the vessel when he tripped and fell on his way to get his hair cut before beginning his hitch. The evidence showed that he had reported to the vessel and learned that the scheduled departure was delayed because of rain before he went to get his hair cut. The jury verdict made Signet Maritime Corporation liable for maintenance and

---

[1] The jury did not find Signet liable on Moran's wrongful termination claim, which would have exposed Signet to further damages. (Docket Entry No. 90 at 2).

cure for the injuries Moran sustained when he tripped in the parking lot of the hair salon on his way to get his hair cut. (Docket Entry No. 90 at 1).

The parties tried damages—maintenance and cure—to the bench on February 11, 2023. Based on the parties' briefing, the bench-trial testimony (live and by deposition), the record, and the relevant law, the court enters the following findings of fact and conclusions of law. No later than **May 5, 2023**, Moran must submit a proposed final judgment consistent with these findings and conclusions. The proposed judgment must be accompanied by a memorandum in support containing an itemized list of medical expenses stating the identity of the provider, the purpose of each visit or procedure, the medical expenses that have already been paid, and the identity of the payor.

I.   **Findings of Fact**

   A.  **Background and Procedural History**

      1.  **Background**

1. On September 29, 2021, Moran tripped, fell, and fractured his ankle on his way to get a hair cut on the day he was scheduled to begin a 28-day "hitch."

2. Immediately following his fall, and on several more occasions between September 2021 and February 2022, Moran sought medical treatment for foot and ankle injuries. He did not complain of, or seek treatment for. any other injury or pain that he claimed was related to the September 29, 2021, fall until February 17, 2022.

3. On October 13, 2021, Signet terminated Moran's employment. Signet terminated Moran for the stated reason that, on August 20, 2021, Moran violated company rules for pushing barges through the Brazos River Floodgates, causing one of the barges to collide with a lock wall. The collision cost Signet more than $100,000 to repair.

4.     In demand letters to Signet dated November 5 and December 17, 2021, Moran's counsel sought the payment of maintenance and cure benefits and compensation for the scheduled 28-day hitch Moran missed because of his injury. (*See generally* PX 1). The December 17, 2021, letter included a schedule of Moran's living expenses, out-of-pocket medical expenses, and medically related travel expenses for the foot and ankle injury he had received in the September 29, 2021, fall. (*Id.* at HLF_MOR 000407).

5.     Neither letter referred to or mentioned any injury other than the fracture to Moran's right foot or ankle. (*Id.* at HLF_MOR 000404, 000406).

6.     Signet and Moran disputed whether Moran had injured his foot and ankle while in the service of the vessel or while on a personal errand. Signet did not pay Moran maintenance and cure benefits for the foot and ankle injury and did not pay him unearned wages.

7.     Following his fall and foot and ankle injury, Moran received short- and long-term disability benefits from MetLife. Signet had paid the MetLife policy premiums. The benefits, as confirmed by Signet's corporate representative's testimony, cover both work- and non-work-related injuries and are not tied to Moran's length of service. There is no evidence that the MetLife plan contains language requiring plan benefits to offset any maintenance and cure liability incurred by Signet.

8.     From January 22, 2023, through the bench trial, Moran received $5,000 monthly in long-term disability insurance benefits. The total amount of long-term disability Moran received through February 11, 2023, is $64,160.33

### 2. Procedural History

9.     Moran filed his original petition on December 21, 2021, in the District Court of Harris County, Texas. (Docket Entry No. 1-3). Signet removed the suit on December 30, 2021. (Docket Entry No. 1). Moran subsequently amended his complaint. (Docket Entry Nos. 6, 13).

10. In August 2022, the court granted Signet's motion for summary judgment on the issue of punitive damages. (Docket Entry No. 53). In its memorandum and order, the court found that there was "no evidence supporting an inference that the defendants believed that Moran would file a claim for maintenance and cure until he filed a claim for it on . . . December 17, 2021." (*Id.* at 4). Because there was no evidence supporting "an inference that the defendants exhibited callousness and indifference to Moran's injuries," the court dismissed Moran's punitive damages claim. (*Id.*). The court denied Moran's motion to reconsider that order later that same month. (Docket Entry No. 76).

11. At the final pretrial conference, held on the morning the jury trial was set to begin, Moran announced for the first time to the court that he had seen additional doctors who would present evidence about the foot and ankle injury sustained on September 19, 2001. (*See generally* Docket Entry No. 109 (Aug. 30, 2022, Pretrial Conference Transcript)). Discovery had closed in July, but the relevant medical records had been sent to Signet's counsel around August 12 and an updated witness list, including the newly disclosed providers, on August 22. (*Id.* at 13:7–14:4). Moran also disclosed that he had received an MRI on August 22. (*Id.* at 15:22–23).

12. Because the recent medical visits presented new evidence on the extent of the damages sought, but the liability witnesses and evidence were ready to be presented, the court proposed that the parties try the liability issues to the jury and, depending on the outcome, conduct discovery on the amount of maintenance and cure and try that issue to the bench. (*Id.* at 24:19–25:6). The parties agreed.

13. Beginning on August 30, 2022, the court held a three-day jury trial on Signet's liability for Moran's claims for maintenance and cure and wrongful discharge. (Docket Entry Nos. 80, 81, 84).

14. The jury found that Moran was in the service of a Signet vessel at the time of his fall, but that Moran was not wrongfully terminated. (Docket Entry No. 90 (verdict form)).

15. Moran's continuing medical treatment, the continuous production of treatment records, and the disclosure of additional treating physician witnesses necessitated several additional discovery conferences and delays of the bench trial on maintenance and cure, which was originally set for November 3, 2022. (Docket Entry Nos. 95, 103, 108, 114, 117, 123).

16. On February 11, 2023, the court held a one-day bench trial on Moran's claim for maintenance and cure. The court heard live testimony from Moran; his brother, Ricky Charles Moran; Captain Joshua Macklin, Signet's corporate representative; and the defendant's expert, Dennis Schwartzmeyer. The parties designated portions of the deposition transcripts of the following individuals for the bench trial: Dr. David Bloome, Dr. Gerald Calegan, Dr. Duwayne Edge, Dr. Brian Kindl, Dr. Eric K. Oberlander, and Dr. A. Aaron Rodriguez. (Docket Entry No. 153; *see also* Docket Entry Nos. 130–141 (designations)).

**B. Unearned Wages**

17. Moran's daily wage for the hitch he was scheduled to begin on September 29, 2021, was $575. Moran would also have received an additional $200 for travel related to the hitch.

18. Moran would have been paid an additional amount for each day of the hitch on which he pushed barges containing certain liquid cargoes. Signet's representative, Captain Macklin, testified that Moran's vessel, the *Signet Puritan*, did not push any of these barges during the days Moran would have served as captain had he not tripped on his way to get a hair cut before beginning his hitch. The court finds Macklin's testimony credible, and Moran did not present credible evidence to the contrary.

19. The court finds that Signet owes Moran $16,300 in unpaid wages for the 28-date hitch, which would have begun on September 29, 2021.

### C. Maintenance

20. Moran testified that he spent $150 per week on groceries for himself and his brother. Moran referred to the USDA Food Chart to support his maintenance claim. At the time of Moran's injury, the USDA provided $376.70 a month as a reasonable monthly amount for food expenditures for a man of Moran's age and circumstances.

21. The court finds that $75 per week represents a reasonable maintenance amount for groceries for a man of Moran's age, activities, and condition. This amount does not include money Moran spent on his brother's food.

22. The parties do not dispute that Moran's lodging expenses when he lived on a boat totaled approximately $1,621.06 per month, until the boat was apparently repossessed in mid-May 2022.[2] The court finds that this was a reasonable lodging expense.

23. In August 2020, after a hurricane damaged his boat, Moran began to live part-time at his brother's house. Moran has not claimed expenses related to any repairs made to the boat. After his boat was apparently repossessed, in mid-May 2022, Moran established his permanent residence at his brother's home.

24. While Moran still possessed his boat in Spring 2022, he purchased a camper trailer. The court finds that Signet is not obligated to pay living expenses related to Moran's purchase of a camper trailer because Moran, at the time the trailer was purchased, was already living part-time at his brother's and had not sold his former permanent residence, the boat.

---

[2] Signet asks the court to divide this figure in half to reflect Moran's residence at his brother's home for a portion of the maintenance period. As Signet acknowledges, Moran lived with his brother following damage to his home from Hurricane Laura. Signet has not submitted authority suggesting that a move or partial move necessitated by a natural disaster should result in diminished maintenance expenses. Courts have found defendants not liable for maintenance when the plaintiff has lived with others and failed to present evidence of his own costs, *see, e.g.*, *Curry v. Fluor Drilling Servs., Inc.*, 715 F.2d 893, 896 (5th Cir. 1983), which is not the case here.

Moran has also submitted evidence of expenses related to his truck, cell-phone service, and internet service. Moran has not persuaded the court that maintenance covers such expenses. *Cf. Atl. Sounding Co., Inc. v. Townsend*, 557 U.S. 404, 413 (2009) ("[M]aintenance" includes food and lodging at the expense of [the seaman's] ship . . . ."); *In re 4-K Marine, L.L.C.*, 914 F.3d 934, 937 (5th Cir. 2019) (stating that "maintenance" is a "per diem living allowance for food and lodging"); THOMAS J. SCHOENBAUM, 1 ADMIRALTY AND MARITIME LAW § 6:28 (6th ed.) ("Maintenance" is the right of a seaman to food and lodging if he falls ill or becomes injured while in the service of the ship.").

### D. Cure

#### 1. Injuries Subject to Cure Benefits

25. Moran seeks cure benefits related to injuries to his ankle, shoulder, and back.

26. The parties do not dispute that Moran is entitled to cure benefits related to the foot and ankle injuries he sustained when he tripped and fell in the parking lot on his way to get his hair cut. The parties dispute whether Moran is entitled to cure benefits for the back and shoulder injury he first reported six months after the trip and fall incident. The court finds that he is not.

27. After his fall, Moran did not complain to Signet or to his doctors of injuries to his back and shoulder for several months. (*See, e.g.*, PX 1; PX 29 at HLF_MOR 001122; PX 31 at HLF_MOR 001388).

28. Moran first complained of issues with his shoulder and back in February 2022 and August 2022, respectively—over four or nine months after he tripped and fell. The only injury Moran reported within four months after the fall was to his right foot and ankle.

29. The delay between when Moran tripped and fell (September 2021) and when he first reported back and neck injuries (February or August 2022) is too significant to support an inference that those injuries were caused or contributed to by the fall.

30. The credible testimony and documentation of Moran's medical providers does not support a finding that these injuries were more likely than not caused or contributed to attributable to the fall.

31. Moran's medical providers testified that many individuals suffer from back and neck pain in the absence of a fall or other trauma. Dr. Calegan, Moran's neurologist, testified that it is "unusual" for a patient with radiculopathy, such as Moran, to not complain of back pain. (PX 32 at HLF_MOR 001573). Dr. Oberlander, a neurosurgeon, testified that "most [spine patients] also have bad—also have back pain, but not—not 100 percent." (PX 33 at HLF_MOR 001662). This testimony strongly suggests any issue with Moran's back was not caused by the fall.

32. Moran testified that he first reported shoulder pain to Dr. Kindl, an orthopedist whose practice frequently involves shoulder injuries, in February 2022, after he picked up something heavy and experienced pain. Dr. Kindl testified that a patient experiencing a torn rotator cuff, Moran's diagnosis, would likely consistently complain of pain following the injury. (PX 31 at 33:23–34:6). The circumstances surrounding Moran's shoulder pain do not support a finding that it was caused by his September 2021 fall.

33. Moran's silence to Signet and to the court regarding his shoulder and back injuries until virtually the eve of the jury trial further reduces the credibility of his claim that, months after his fall in the parking lot caused him to injure his foot and ankle, the same fall caused back and neck injury. Moran's testimony linking the September 2021 fall to the shoulder and back injuries he first reported in February and August 2022 is simply not credible.

34. The court finds that while Moran is entitled to damages for his foot and ankle injury sustained in the parking lot fall in September 2021, he is not entitled to damages for the back and

shoulder pain and symptoms he did not report until months after that fall, and that make up the bulk of the damages he seeks.[3]

### 2. Date of Maximum Medical Improvement

35. Maintenance and cure benefits terminate on the date of maximum medical improvement. Maximum medical improvement is reached when "it is probable that further treatment will result in no betterment in the claimant's condition." *McBride v. Estis Well Serv., L.L.C.*, 853 F.3d 777, 783 (5th Cir. 2017) (quoting *Boudreaux v. United States*, 280 F.3d 461, 468 (5th Cir. 2002)). "When there are ambiguities or doubts [as to liability for maintenance and cure], they are resolved in favor of the seaman." *Vaughan v. Atkinson*, 369 U.S. 527 (1962).

36. Moran testified as to several trips he took in the months shortly before the July 15, 2022 medical examination. The court finds the evidence that Moran's own testimony that he was able to walk extensively during these vacations—which included a two-day trip to New Orleans in late February or early March of 2022, a several-day trip to the Universal Studios theme park in Florida in March 2022, and a two-day trip to a strawberry festival in April 2022—to be more persuasive evidence of Moran's physical symptoms and capabilities than his imprecise and inconsistent testimony about his limitations. Although Moran testified that he was not fully recovered during these trips, the court finds that Moran's ability to walk extensively during the trips supports finding significant improvement to his foot and ankle by March 2022.

37. Dr. David Bloome, an orthopedic surgeon, reviewed Moran's medical records related to his foot and ankle injury and examined Moran on July 15, 2022. (PX 30 at HLF_MOR

---

[3] The court has previously ruled that Moran may not seek cure benefits related to his diagnoses for "monoclonal gammopathy of undetermined significance" or "smoldering myeloma." There is no dispute that the fall did not cause or contribute to these conditions and no jury finding that these conditions arose during Moran's service to a Signet vessel.

001302).  Dr. Bloome's opinion was limited to Moran's ankle injury. (*Id.* at HLF_MOR at 001305).  Dr. Bloome testified that Moran's ankle had "healed" before he performed his examination on July 15, 2022. (*Id.* at HLF_MOR 001291).  The medical evidence supports finding that maximum medical improvement was reached with respect to the ankle and foot injury no later than July 15, 2022.

38. The court finds Moran's testimony suggesting that his ankle has not reached maximum medical improvement to be unpersuasive.  Moran is not a medical professional.  His testimony as to residual weakness in his foot causing the foot to "drop" and give him brief "shocks" when he walks is inconsistent with the testimony about his ability to enjoy vacations that feature extensive walking.

39. This finding is consistent with the medical testimony linking any lingering neuropathy in Moran's ankle to his diabetes, which predates his September 2019 fall, or to age-related degeneration. (*See*, *e.g.*, PX 32 at HLF_MOR 001548–49 (testimony from Dr. Calegan stating that Moran's neuropathy likely existed before the fall and that diabetic neuropathy cannot be cured); 001573–74 (agreeing that an August 22, 2022 MRI of Moran's back showed age-related degenerative changes, not evidence of trauma)).

40. The court finds that Moran reached maximum medical improvement for his September 2021 foot and ankle injury, which was the only injury sustained in the service of the vessel, by July 15, 2022.[4]  (PX 30 at HLF_MOR 001291).

---

[4] The date of maximum medical improvement proposed by Signet, March 29, 2022, is based on Dr. Rodriguez's speculation, rather than on a contemporaneous examination of Moran's ankle.  Additionally, the doctors' testimony consistency supports the finding that an injury to a diabetic such as Moran is likely to take longer to heal—all else being equal—than an injury to a non-diabetic.  Dr. Rodriguez's opinion may be correct, and it indeed seems likely that Moran had reached maximum medical improvement prior to July 15, 2022.  The court rejects the March 29 date because an employer attempting to demonstrate that maximum medical improvement has been reached must provide "unequivocal" evidence of maximum cure.

### 3. Mileage

41. The court finds that Moran should be awarded mileage for travel to and from his doctors at the rate set by the IRS for miles driven to obtain medical treatment. The IRS sets this rate at 16 cents and 18 cents per mile for 2021 and 2022, respectively. The court finds this rate, rather than the business rate, is appropriate because travel for medical purposes relates to Signet's cure obligations. Additionally, because maintenance does not cover automotive expenses, it would be inappropriate to reimburse Moran at a rate—such as the IRS business rate—intended to reflect all costs of operating a vehicle.

42. The court awards mileage from the date of the fall through July 15, 2022; however, the court finds that Moran cannot recover mileage for visits made to providers in Texas before he returned home to Louisiana following the accident. On September 29, 2021, Moran traveled to Texas to report to work, not to see medical providers.

## II.   Conclusions of Law

### A. Compensatory and Punitive Damages

43. "A Jones Act employer who 'unreasonably rejects [a maintenance and cure] claim' becomes liable for compensatory damages, and employers who have 'not only been unreasonable but ha[ve] been more egregiously at fault,' are liable for punitive damages and attorney's fees." *In re 4-K Marine*, 914 F.3d at 938 (quoting *Morales v. Garijak, Inc.*, 829 F.2d 1355, 1358 (5th Cir. 1987)).

---

*Johnson v. Marlin Drilling Co.*, 893 F.2d 77, 79 (5th Cir. 1990); *see also Weeks Marine, Inc. v. Watson*, 190 F. Supp. 3d 588, 597 (E.D. La. 2016) ("Termination of maintenance and cure must be unequivocal to [e]nsure that its beneficent purpose is achieved.").

44.     Moran is not entitled to compensatory or punitive damages. The court has already ruled that Moran is not entitled to punitive damages, and subsequent events do not undermine confidence in that decision. (Docket Entry Nos. 53, 76).

45.     There was no dispute as to where or when Moran fell. It was in parking lot, on his way to get a hair cut. He did not fall on Signet property or a Signet vessel, or while clearly performing work for Signet, or in other circumstances that would have provided Signet with clear and prompt notice of its maintenance and cure obligations. Signet would be liable for maintenance and cure benefits regardless of the state of the salon parking lot and regardless of the injury Moran sustained. Photographs of the scene of the fall and doctors' statements about Moran's injuries, which Moran argues Signet should have obtained in a proper investigation of his claim, would be of minimal to no relevance in determining whether Moran was in the service of the vessel when he tripped in the parking lot in front of the Diva hair salon on his way to get his hair cut.

46.     Moran provides no authority suggesting that denying maintenance and cure benefits under such circumstances is unreasonable. Signet's failure to pay maintenance and cure benefits before the jury's verdict was not unreasonable, given the disputes over whether the injury was in the service of the vessel and the extent of the injury or damages Moran sustained. Signet's failure to pay following the jury's verdict on liability was not unreasonable, given the remaining disputes about the amount of benefits Signet owed. Signet was not responsible for the delay between the jury trial on liability and the bench trial on damages.

**B. Offset**

47.     Signet is not entitled to offset its maintenance and cure obligation by the amount of the MetLife long-term disability benefits, because Signet has not established that the primary purpose of the disability plan was to indemnify Signet against liability. Macklin's testimony confirmed that Signet's plan covered nonwork injuries, for which it was unlikely to incur liability.

*Davis v. Odeco, Inc.*, 18 F.3d 1237, 1245 (5th Cir. 1994) (the coverage of nonwork injuries is evidence that employer did not establish a plan to reduce its own legal liability); *Joseph v. River Parishes Co., Inc.*, 2000 WL 1134363, at *3 (E.D. La. Aug. 9, 2020) (same, with respect to a plan that covered both work and nonwork injuries); *see also Phillips v. W. Co. of N. Am.*, 953 F.2d 923, 932 (5th Cir. 1992) (directing courts to ask whether a benefit "was intended to respond to potential future legal liability").

### C. Prejudgment Interest

48. Under maritime law, prejudgment interest "is the rule, rather than the exception." *Corpus Christi Oil & Gas Co. v. Zapata Gulf Marine Corp.*, 71 F.3d 198, 204 (5th Cir.1995); *Wyatt v. Penrod Drilling Co.*, 735 F.2d 951, 956 (5th Cir. 1984) ("[P]rejudgment interest is awarded almost as a matter of course in cases tried to a judge under general maritime principles . . .").

49. The Texas Financial Code provides that "prejudgment interest accrues on the amount of a judgment during the period beginning on the earlier of the 180th day after the date the defendant receives written notice of a claim or the date the suit is filed and ending on the day preceding the date judgment is rendered." TEX. FIN. CODE § 304.104.

50. The earlier date is when suit was filed,[5] December 21, 2021.

---

[5] Signet misreads the statute when it proposes that prejudgment interest accrues from the earlier of 180 days following written notice or 180 days following the filing of suit. The 180-day accrual delay applies only to the "written notice" portion of the statute. *See May v. Ticor Title Ins.*, 422 S.W.3d 93, 103 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("Prejudgment interest begins to accrue on the earlier of (1) 180 days after the defendant receives written notice of the claim, or (2) on the date the suit is filed."); *Town of Flower Mound v. Teague*, 111 S.W.3d 742, 763 (Tex. App.—Fort Worth 2003, pet. denied) (providing the same reading of the statute).

**III.     Order**

The court will issue judgment consistent with its findings of fact and conclusions of law, in accordance with Federal Rule of Civil Procedure 58.

No later than **May 5, 2023**, Moran must submit a proposed final judgment consistent with these findings and conclusions. The proposed judgment must be accompanied by a memorandum in support containing an itemized list of medical expenses stating the identity of the provider, the purpose of each visit or procedure, the medical expenses that have already been paid, and the identity of the payor.

SIGNED on April 17, 2023, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge